Rosemary M. Rivas (SBN 209147)
Amy M. Zeman (SBN 273100)
Rosanne L. Mah (SBN 242628)
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
rmr@classlawgroup.com
amz@classlawgroup.com
rlm@classlawgroup.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN HOCKER, BRIAN CARRILLO, DEEPA HAYRE, and FRED CHAPMAN, on behalf of themselves and all others similarly situated,<br><br>              Plaintiffs,<br>   v.<br><br>FCA US LLC, a Delaware corporation, and CUMMINS INC., an Indiana corporation,<br><br>            Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Brian Hocker, Brian Carrillo, Deepa Hayre, and Fred Chapman, on behalf of themselves and all others similarly situated, allege the following based on their personal experience and their counsel's investigation:

**NATURE OF THE CASE**

1. Defendant FCA US LLC and Cummins, Inc. have had a longstanding partnership for the design and production of engines for Ram trucks. In 2007, the Cummins 6.7-liter diesel engine was first introduced for use in Ram 2500 and 3500 trucks as providing increased power and torque while achieving the Environmental Protection Agency's emissions standards for nitrogen oxide. Over the years, Defendants continued to market the Ram 2500 and 3500 trucks as strong, powerful, and clean. Moreover, the Cummins diesel engine has become synonymous with the Ram, with 80% of customers selecting Rams with the Cummins diesel engine. The unsuspecting public and state and federal regulators, however, were unaware that Defendants circumvented emissions testing and certification requirements.

2. Defendants' 2013-2023 Ram 2500 and 3500 trucks equipped with a Cummins 6.7-liter diesel engine ("Class Vehicles"), have undisclosed and illegal emission control devices that allowed the Class Vehicles to comply with applicable regulations when undergoing emissions testing, thereby producing results that pass emission standards. But when driven in real world conditions, the illegal emission control devices installed on the Class Vehicles reduce the effectiveness of the emission control system, resulting in increased pollution of nitrogen oxide (NOx) that exceed legal limits.

3. NOx increases the accumulation and formation of harmful smog and fine particulate matter in air. People with heart or lung problems, children, older adults, and people who are active outdoors are particularly at risk for adverse health effects relating to smog or exposure to particulate matter. Nitrogen dioxide formed by NOx emissions can worsen respiratory diseases, particularly asthma, and can contribute to asthma development in children.

4. In January 2024, the United States Department of Justice, Environmental Protection Agency ("EPA"), California Air Resources Board ("CARB"), and the California Attorney General's Office announced a settlement obligating Cummins to pay an unprecedented civil penalty under the Clean Air Act of $1.675 billion.

CLASS ACTION COMPLAINT
CASE NO.

5. Attorney General Merrick Garland stated that, "The types of devices we allege that Cummins installed in its engines to defeat federal environmental laws have a significant and harmful impact on people's health and safety. For example, in this case, our preliminary estimates suggest that defeat devices on some Cummins engines have caused them to produce thousands of tons of excess nitrogen oxide emissions. The cascading effect of those pollutants can, over long-term exposure, lead to breathing issues like asthma and respiratory infections."

6. Plaintiffs and proposed Class members did not receive the benefit of their bargain and have suffered economic losses, including out-of-pocket losses, and accordingly bring this suit to recover all available relief.

## PARTIES

7. Plaintiff Brian Hocker is a resident and citizen of San Lorenzo, California.

8. Plaintiff Brian Carrillo is a resident and citizen of Livermore, California.

9. Plaintiff Deepa Hayre is a resident and citizen of Hayward, California.

10. Plaintiff Fred Chapman is a resident and citizen of Bay Point, California.

11. Defendant FCA US LLC ("FCA") is a Delaware corporation with its headquarters and principal place of business in Auburn Hills, Michigan. FCA manufactures, markets, distributes, and sells motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands through its network of motor vehicle dealers located in each state of the United States.

12. Defendant Cummins Inc. is an Indiana corporation. Its headquarters and principal place of business are in Columbus, Indiana. Cummins designs, manufactures, markets, sells, introduces into commerce or delivers for introduction into commerce in the United States a broad range of products, including diesel, natural gas, electric, and hybrid powertrains and related components.

13. The Defendants jointly designed, manufactured, marketed, and sold the Class Vehicles and therefore are referred to collectively in this complaint as "Defendants."

## JURISDICTION AND VENUE

14. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class

action in which Defendants are citizens of different jurisdictions from members of the proposed class, including Plaintiffs.

15.     This Court may exercise jurisdiction over Defendants because they are registered to conduct business in California; have sufficient minimum contacts in California; and intentionally avail themselves of the markets within California through the promotion, sale, marketing, and distribution of the Class Vehicles, thus rendering the exercise of jurisdiction by this Court proper and necessary.

16.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## **SUBSTANTIVE ALLEGATIONS**

### **Defendants' Partnership to Market and Sell Rams with Cummins 6.7-Liter Diesel Engines**

17.     Cummins began producing diesel engines for Dodge Ram trucks starting with the 1989 model year. In 2009, after restructuring, Chrysler cars and minivans were sold under the Dodge brand, while trucks were sold under the Ram brand. Notwithstanding the restructuring, Cummins diesel engines continued to be equipped on Ram trucks and recently, Cummins agreed to a multi-year contract extension to continue producing the Cummins diesel engines for Ram trucks. As of February 2023, Cummins has produced over 1.7 million turbo diesel engines for Ram. Cummins diesel engines are exclusively produced for the Ram 2500 and 3500 trucks.

18.     The first Cummins Turbo Diesel was a 5.9-liter engine with 160 horsepower and 400 pound-feet of torque. Since then, the Cummins Turbo Diesel engine has seen an increase of 118% in horsepower and an 86% increase in torque, which, according to Cummins, was accomplished while also reducing exhaust emissions by 90%.

19.     Diesel engines first became common in American passenger vehicles in the 1970s and 1980s but gained a reputation as "dirty" because they emitted noxious gases and particulate matter. As diesel engines need to be more robust than comparable gasoline engines, diesel-powered vehicles also cost more to produce and command a premium price. These factors, combined with increasingly stringent emissions regulations, caused diesel vehicles to become increasingly unpopular in the American market.

CLASS ACTION COMPLAINT
CASE NO.

20.     The diesel internal combustion engine differs from the typical gasoline powered engine in that it uses highly compressed hot air to ignite the fuel rather than using a spark plug. As in a gasoline engine, the burning fuel rapidly expands, moving the piston, which transmits power to the crankshaft.

21.     Emissions have often been an obstacle for diesel vehicles. While the use of cleaner fuels and new technologies has improved certain types of emissions problems, others remain. As a result of their high combustion and compression pressures, diesel engines typically produce high levels of nitrogen oxides in the combustion process.

22.     Nitrogen oxides (or NOx) are a highly reactive group of gases that the EPA and other government agencies have found to create environmental problems and public health hazards, including smog, ground-level ozone, and acid rain. For example, direct exposure to NOx can cause respiratory problems, such as lung irritation, bronchitis, or pneumonia. When NOx combines with sunlight, it may create photochemical smog, which appears as a brownish ground-level haze and causes chest pains, shortness of breath, coughing and wheezing, and eye irritation. NOx is one of the main ingredients involved in the formation of ground-level ozone. Breathing ozone can also trigger a variety of health problems including chest pain, coughing, throat irritation, and congestion and can worsen bronchitis, emphysema, and asthma. Children are at the greatest risk of experiencing negative health impacts from exposure to ozone. When mixed with rain in the atmosphere, NOx can create nitric acid or acid rain. NOx is also a contributor to global warming.

23.     Diesel engines have an inherent trade-off with respect to power, i.e., the ability to tow; fuel efficiency; and emissions. More power and fuel efficiency goes hand in hand with dirtier and more harmful emissions.  Compared to gasoline engines, diesel engines offer better fuel economy because diesel fuel has more energy than gasoline and diesel engines do not have an intake throttle that typically experiences air intake throttling losses. Diesel engines also have better performance and durability than gasoline engines. In particular, diesel engines have a higher compression ratio and long piston stroke which generates greater torque energy and better acceleration performance. Diesel engines are also designed with components that are more robust compared to gas engines, so they are more durable and longer lasting.

CLASS ACTION COMPLAINT
CASE NO.

24.     In December 2000, the EPA signed emission standards for model years 2007 and later heavy-duty highway engines. The standards involved two components: (1) emission standards, and (2) diesel fuel regulations. The emission standards were as follows:

| EPA emission standards for MY 2007 and later HD diesel engines, g/bhp-hr | | |
|---|---|---|
| NMHC | NO$_x$ | PM |
| 0.14 | 0.20 | 0.01 |

25.     In 2007, Chrysler and Cummins touted that the new 2007 Dodge Ram Heavy Duty engine was built to use a diesel particular filter (DPF) to virtually eliminate particulate matter emissions and an absorber catalyst to "reduce oxides of nitrogen (NOx) by as much as 90 percent." Tom LaSorda, President and CEO of Chrysler Group boasted that working with Cummins, Dodge was the only manufacture to meet the stringent 2010 emission standards in 2007.

26.     According to Cummins' public statements, it was "the first diesel engine manufacturer to have a product certified to the 2010 EPA heavy-duty engine standards for oxides of nitrogen (NOx) and particular matter (PM) emissions, making it the cleanest heavy-duty diesel engine available in North America." Cummins President and Chief Operating Officer Joe Loughrey said at the time that "The application of the right technology on the Dodge Ram is an extension of the joint clean diesel development work Cummins and DaimlerChrysler have performed together for nearly two decades. The new best-in-class Cummins Turbo Diesel and the Dodge Ram will provide the strongest, cleanest, quietest solution for heavy-duty pickup truck customers."

27.     The EPA and the Department of Energy (DOE) also jointly recognized the 2007 Dodge Ram Heavy Duty "as the cleanest mass-production diesel-engine pickup truck on the market."

28.      The Cummins diesel engine became synonymous with the Dodge Ram truck, and later Ram trucks. Defendants report that eighty percent of Ram truck customers select the Cummins diesel engine, largely because it was touted as providing the most torque and horsepower while being the cleanest.

29.     Defendants have taken advantage of their exclusive relationship in their marketing and advertisements, touting the benefits of increased power and torque that diesel engines provide.

Defendants' advertisements specifically reference the Cummins diesel engines available with the Ram trucks:





CLASS ACTION COMPLAINT
CASE NO.



POWER IN NUMBERS

These numbers don't lie. The 2023 Ram 2500 boasts a maximum payload of 4,000 pounds when equipped with the 6.4L HEMI® V8 engine and an impressive maximum towing capacity of 19,980 pounds⊕ when equipped with the available 6.7L Cummins® Turbo Diesel I6 engine.

MAXIMUM DIESEL
TOWING POUNDS⊕
**19,980**

MAXIMUM GAS
PAYLOAD POUNDS⊕
**4,000**

**Explore Towing Guide  >**

### Defendants' Rams have Illegal Defect Devices

30.     In 2015, EPA warned vehicle manufacturers that it planned to conduct testing to identify illegal cheat devices that skirt emission standards and exceed pollution limits. In that same year, EPA issued a Notice of Violations to Volkswagen that its light-duty motor vehicles—nearly 11 million worldwide—contained illegal defeat devices. Ultimately, Volkswagen paid more than $14 billion to settle the allegations of cheating emission testing and deceiving consumers.

31.     EPA also issued a Notice of Violations to FCA in January 2017 for failing to disclose or justify the presence of defeat devices in 2014-2016 Ram 1500 EcoDiesel and 2014-2015 Jeep Grand Cherokee EcoDiesel vehicles.

32.     Despite EPA's warnings to manufacturers, a prior Notice of Violations to FCA, and its concerted efforts to stamp out the use of defeat devices and emissions cheating, including the record-setting fines and settlements paid by Volkswagen, Defendants continued to install defeat devices in the Class Vehicles through 2023.

33.     On January 10, 2024, the U.S. Department of Justice, EPA, California Air Resources Board, and the California Attorney General's Office announced a settlement with Cummins stemming from alleged violations of the Clean Air Act and California law. Under the agreement, Cummins agreed to pay a record-setting civil penalty of $1.675 billion, which is the largest civil penalty assessed under

CLASS ACTION COMPLAINT
CASE NO.

the Clean Air Act. Additionally, Cummins agreed to spend more than $235 million in remedying the violations.

34.    According to federal and state regulators, approximately a million model years 2013-2023 Ram 2500 and 3500 pickup trucks with Cummins diesel engines were equipped with undisclosed engine control software features, and more than 630,000 of those trucks (model years 2013-2019) were equipped with illegal emissions control software defeat device features. The software defeat devices enabled the trucks to pass standard EPA emissions tests but reduced the effectiveness of the emission controls and during normal driving conditions outside testing standards and increased NOx emissions.

35.    According to Attorney General Merrick B. Garland, "The types of devices we allege Cummins installed in its engines to cheat federal environmental laws have a significant and harmful impact on people's health and safety. This historic agreement makes clear that the Justice Department will be aggressive in its efforts to hold accountable those who seek to profit at the expense of people's health and safety."

36.    Further, Assistant Attorney General Todd Kim of the Justice Department's Environment and Natural Resources Division stated, "Today's agreement, which includes the largest-ever Clean Air Act civil penalty, stands as notice to manufacturers that they much comply with our nation's laws, which protect human health and the health of our environment."

37.    According to EPA, "Cummins installed illegal cheat devices on more than 600,000 RAM pickup trucks, which exposed overburdened communities across America to harmful pollution." And California Attorney General Rob Bonta stated, "Cummins knowingly harmed people's health and our environment when they skirted state emissions tests and requirements."

**Defendants Skirted Emissions Standards, Testing and the Certificate of Conformity Process**

38.    In the United States, all light-heavy-duty motor vehicles, such as the Class Vehicles, are required to meet emission standards for specific air pollutants, such as NOx. 40 C.F.R. §§ 86.1811, 86.1811-09, 86.1811-10, and 86.1818-12.

39.    For purposes of showing compliance with emission standards, vehicle manufacturers organize cars into "Test Groups." 40 C.F.R. § 86.1803-01. Generally, a Test Group consists of vehicles

with similar engine design that are subject to the same emission standards for pollutants under the Act. 40 C.F.R. §§ 86.1803-01, 86.1827-01(a).

40. EPA uses four different tests to measure tailpipe emissions, such as NOx, from vehicle Test Groups to establish compliance with emission standards. The tests are: (1) the Federal Test Procedure ("FTP"), also known as the "FTP-75," used to evaluate emissions during urban driving conditions; (2) the Highway Fuel Economy Test ("HWFET"), used to evaluate emissions in highway driving conditions; (3) the Supplemental Federal Test Procedure US06 ("SFTP US06"), used to evaluate emissions during aggressive and high-speed driving conditions; and (4) the Supplemental Federal Test Procedure SC03 ("SFTP SC03"), used to measure emissions when a vehicle's air conditioning is being used.

41. Each of the four tests has a protocol of fixed sequences, parameters, and driving cycles. For example, the FTP test is always performed in three phases with identical driving times, driving speeds, acceleration intervals, deceleration intervals, engine soak times (i.e., non-driving and non-sampling times before or in between phases), engine "key-off" intervals, and ambient air temperature range. 40 C.F.R. §§ 1066.801(d), 1066.815(d). The emission tests are conducted using a chassis dynamometer, which uses a roller or rollers simulating a road in a controlled environment, such as inside a facility.

42. Every class of vehicles introduced into commerce in the U.S. must be covered by a Certificate of Conformity issued by the EPA. The EPA issues Certificates of Conformity ("COC"), to regulate the placement of new motor vehicles into U.S. commerce. The Clean Air Act prohibits vehicle manufacturers from selling, offering for sale, introducing into commerce, or delivering for introduction into commerce, or any person from importing into the U.S., any new motor vehicle without a COC issued by the EPA under regulations prescribed by the Act's motor vehicle emission standards. 40 C.F.R. § 86.1854-12(a)(1).

43. To receive a COC, vehicle manufacturers such as Defendants are required to submit an application to the EPA for each model year and each Test Group of new motor vehicles that will enter U.S. commerce. Each application must be in writing, signed by the manufacturer's authorized representative, and include a statement that the motor vehicles in the Test Group comply with all

applicable regulations in 40 C.F.R. Chapter 1. 40 C.F.R. § 86.1844-01(d). Manufacturers have the option of submitting COC applications electronically via the EPA's Engines and Vehicles Compliance Information System, formerly known as the "Verify" system (together, "EV-CIS), which is the EPA compliance information system for motor vehicles, engines, and equipment used for transportation and other mobile source applications.

44. Manufacturers use EV-CIS for purposes of submitting certification and compliance information for emissions and fuel economy. The EV-CIS requires manufacturers to confirm that the Test Group that is the subject of the COC application complies with applicable emission regulations before a manufacturer may submit a COC application through EV-CIS. Motor vehicles will be covered by a COC only if the vehicles are as described in the manufacturer's COC application "in all material respects." 40 C.F.R. §§ 86.1848-10(c)(6).

45. Prior to the issuance of a COC, manufacturers are required to provide the EPA all the information set forth in 40 C.F.R. § 86.1844-01(d), 40 C.F.R. § 86.1843-01(c). Every COC application must contain, among other things, a list of all auxiliary emission control devices ("AECDs") installed on the motor vehicles, in addition to a justification for each AECD, the parameters they sense and control, a detailed justification of each AECD that results in a reduction in effectiveness of the emission control system, and an explanation as to why it is not a defeat device. 40 C.F.R. § 86.1844-01(d)(11).

46. An AECD is defined as "any element of design which senses temperature, vehicle speed, engine (revolutions per minute), transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." 40 C.F.R. § 86.1803-01. An element of design is defined as "any control system (i.e., computer software, electronic control system, emission control system, computer logic), and/or control system calibrations, and/or the results of systems interaction, and/or hardware items on a motor vehicle or motor vehicle engine." 40 C.F.R. § 86.1803-01. A new motor vehicle with a COC application that does not disclose an AECD does not conform with the COC application in all material respects and thus, is not covered by the COC.

47. Electronic control modules ("ECMs"), which are installed in modern vehicle engines, control functions in motor vehicles using software that is integrated in the ECM hardware. For every

CLASS ACTION COMPLAINT
CASE NO.

function, such as the rate of fuel injected in the engine, the software contains algorithms that process inputs, i.e., ambient temperature or engine speed, to the ECM and delivers messages to engine components to perform specific actions based on the inputs. ECM software has a large number of variables that can be set by manufacturers, and which define the thresholds or other values used in the software algorithms. Vehicle manufacturers are able to calibrate the software variables to establish the motor vehicle's emissions performance, among other things.

48. ECM software in a motor vehicle that senses inputs such as ambient temperature, engine speed, or duration of engine operation and then sends a message to control the operation of an emission control system component is an AECD. 40 C.F.R. § 86.1803-01. ECM software is also considered a defeat device that "reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use, unless: (1) Such conditions are substantially included in the Federal emission test procedure; (2) The need for the AECD is justified in terms of protecting the vehicle against damage or accident; (3) The AECD does not go beyond the requirements of engine starting; or (4) The AECD applies only for emergency vehicles . . . ." 40 C.F.R. § 86.1803-01.

49. Defendants agreed that Cummins would submit the COC applications for the Class Vehicles. The COC applications for the Class Vehicles contained a description of the elements of design that were installed in the Class Vehicles to comply with federal emission regulations, including engine control systems and after-treatment control systems. The COC applications also described that each of the Class Vehicles had an EGR system installed to reduce the formation of NOx in the engines. They also described an SCR after-treatment control system installed to reduce NOx prior to emission from the tailpipe of the Class Vehicles.

50. The Class Vehicles employ AECDs with specific software functions and calibrations and the AECDs rely on inputs such as speed of the vehicle, coolant temperature, duration of the vehicle's operation, and NOx concentration in the exhaust for the purpose of activating, modulating, delaying, or activating the operation of any part of the emission control system.

51. According to regulators, when undergoing federal emission testing, including the Federal Test Procedure and other test cycles used to obtain a COC, the Class Vehicles' ECM software functions

and calibrations operate the EGR and SCR systems to produce emission results that appear to comply with emission standards. But outside of the federal emission testing and during normal operation, certain AECDs included as ECM software functions and calibrations for the 2013-19 Rams cause reductions in the effectiveness of the emission control system, including the after-treatment control system, resulting in increased levels of NOx. Defendants installed the AECDs in more than 630,000 2013-2019 Rams. Defendants did not disclose the AECDs on the COC applications for the 2013-2019 Rams. Defendants also failed to disclose certain other AECDs on the COC applications for the 2013-2019 and 2019-2023 Rams.

52.     According to regulators, all of the AECDs installed on the Class Vehicles are designed specifications of the manufactured Class Vehicles that materially differed from their description in the COC applications. Further, each Class Vehicle has one or more undisclosed AECD that was not disclosed in the COC application purportedly covering each Class Vehicle. Accordingly, none of the Class Vehicles are covered by a COC and were illegally sold in the United States.

53.     Regulators also found that undisclosed AECDs, individually, or in combination with other undisclosed AECDs installed on the 2013-2019 Rams have the principal effect of bypassing, defeating, or rendering inoperative engine control and/or after-treatment control systems installed on those vehicles. The undisclosed AECDs, individually, or in combination with other undisclosed AECDs installed on the 2013-2019 Rams remove or render inoperative engine control and/or after treatment control systems installed on those vehicles, according to regulators.

54.     Defendants knew that the undisclosed AECDs installed on the 2013-2019 Rams were component parts of those vehicles being offered for sale or installed for such use or put to such use. The undisclosed AECDs have resulted in increased NOx emissions from each Class Vehicle above legal limits.

## PLAINTIFFS' EXPERIENCES

### A.     Brian Hocker

55.     Plaintiff Hocker bought a new, 2021 Ram 2500 in May 2021 at San Leandro Chrysler Dodge Jeep RAM, an authorized FCA dealership located in San Leandro, California.

CLASS ACTION COMPLAINT
CASE NO.

56.     Before buying his 2021 Ram 2500, Mr. Hocker did extensive research, including reviewing Edmonds and Car & Driver. He wanted a truck with a combination of torque, power, fuel efficiency, and a clean-burning system.

57.     Mr. Hocker saw advertisements representing that the 2021 Ram 2500 purportedly had: (1) a clean-burning diesel exhaust fluid system that would emit less pollutants compared to gasoline-powered vehicles; (2) good fuel economy; and (3) strong towing and hauling capabilities. These were among the reasons Mr. Hocker bought the 2021 Ram 2500. Also, before buying the 2021 Ram 2500, he talked to dealership personnel, and test drove the 2021 Ram 2500.

58.     Mr. Hocker did not know at the time he bought the 2021 Ram 2500 that it was equipped with illegal emissions control software defeat devices designed to cheat emission tests, and that it could perform as advertised only by emitting pollutants, such as NOx, at levels that are above legal limits, greater than what was advertised, and greater than emissions emitted from gasoline-powered vehicles.

59.     Mr. Hocker has suffered a concrete injury as a direct and proximate result of Defendants' unlawful conduct. Had Defendants not concealed the emissions control software defeat devices and disclosed that the Class Vehicles could perform as advertised only by emitting pollutants at unlawful levels, Mr. Hocker would have seen and reviewed such disclosures and would not have purchased the 2021 Ram 2500 or would have paid less for it. Mr. Hocker would also not have paid the premium charged for the 2021 Ram 2500 versus a comparable gasoline-powered truck.

**B.     Brian Carrillo**

60.     Plaintiff Carrillo bought a new 2020 Ram 2500 in January 2021 at San Leandro Chrysler Dodge Jeep RAM, an authorized FCA dealership located in San Leandro, California.

61.     Before buying his 2020 Ram 2500, Mr. Carrillo did extensive research on the 2020 Ram 2500. He wished to buy a truck with a combination of torque, power, fuel efficiency, and a clean-burning system.

62.     Mr. Carillo researched, heard, viewed, and/or read representations that the 2020 Ram 2500 purportedly had: (1) a clean-burning diesel exhaust fluid system that would emit less pollutants compared to gasoline-powered vehicles; (2) good fuel economy; and (3) strong towing and hauling capabilities. These were among the reasons Mr. Carrillo bought the 2020 Ram 2500. Also, before buying the 2020

Ram 2500, he reviewed and relied on information set forth in the Monroney sticker affixed to the 2020 Ram 2500's window, including talking to dealership personnel.

63.     Mr. Carrillo did not know at the time he bought the 2020 Ram 2500 that it was equipped with illegal emissions control software defeat devices designed to cheat emission tests, and that it could perform as advertised only by emitting pollutants, such as NOx, at levels that are above legal limits, greater than what was advertised, and greater than emissions emitted from gasoline-powered vehicles.

64.     Mr. Carrillo has suffered a concrete injury as a direct and proximate result of Defendants' unlawful conduct. Had Defendants not concealed the emissions control software defeat devices and disclosed that the Class Vehicles could perform as advertised only by emitting pollutants at unlawful levels, Mr. Carrillo would have seen and reviewed such disclosures and would not have purchased the 2020 Ram 2500 or would have paid less for it. Mr. Carrillo would also not have paid the premium charged for the 2020 Ram 2500 versus a comparable gasoline-powered truck.

**C.    Deepa Hayre**

65.     Plaintiff Hayre bought a new 2019 Ram 2500 in November 2019 at Hilltop Chrysler Dodge Jeep RAM, an authorized FCA dealership located in Richmond, California.

66.     Before buying his 2019 Ram 2500, Mr. Hayre did extensive research on the 2019 Ram 2500. He wished to buy a truck with a combination of torque, power, fuel efficiency, and a clean-burning system.

67.     Mr. Hayre researched, heard, viewed, and/or read representations that the 2019 Ram 2500 purportedly had: (1) a clean-burning diesel exhaust fluid system that would emit less pollutants compared to gasoline-powered vehicles; (2) good fuel economy; and (3) strong towing and hauling capabilities. These were among the reasons Mr. Hayre bought the 2019 Ram 2500. Also, before buying the 2019 Ram 2500, he reviewed and relied on information set forth in the Monroney sticker affixed to the 2019 Ram 2500's window, including talking to dealership personnel, and taking a test drive.

68.     Mr. Hayre did not know at the time he bought the 2019 Ram 2500 that it was equipped with illegal emissions control software defeat devices designed to cheat emission tests, and that it could perform as advertised only by emitting pollutants, such as NOx, at levels that are above legal limits, greater than what was advertised, and greater than emissions emitted from gasoline-powered vehicles.

CLASS ACTION COMPLAINT
CASE NO.

69.     Mr. Hayre has suffered a concrete injury as a direct and proximate result of Defendants' unlawful conduct. Had Defendants not concealed the emissions control software defeat devices and disclosed that the Class Vehicles could perform as advertised only by emitting pollutants at unlawful levels, Mr. Hayre would have seen and reviewed such disclosures and would not have purchased the 2019 Ram 2500 or would have paid less for it. Mr. Hayre would also not have paid the premium charged for the 2019 Ram 2500 versus a comparable gasoline-powered truck.

**D.     Fred Chapman**

70.     Plaintiff Chapman bought a new 2015 Ram 3500 in March 2016 at Elk Grove Dodge Chrysler Jeep RAM, an authorized FCA dealership located in Elk Grove, California. Mr. Chapman also bought a new 2016 Ram 2500 in May 2016 at Antioch Chrysler Jeep Dodge RAM, an authorized FCA dealership located in Antioch, California.

71.     Before buying his 2015 Ram 3500 and 2016 Ram 2500, Mr. Chapman did extensive research on the 2015 Ram 3500 and 2016 Ram 2500, including on the Ram website and authorized FCA dealership websites. He wished to buy a truck with a combination of torque, power, fuel efficiency, and a clean-burning system.

72.     Mr. Chapman saw on the Ram website and on authorized FCA dealership websites representations that the 2015 Ram 3500 and 2016 Ram 2500 purportedly had: (1) a clean-burning diesel exhaust fluid system that would emit less pollutants compared to gasoline-powered vehicles; (2) good fuel economy; and (3) strong towing and hauling capabilities. These were among the reasons Mr. Chapman bought the 2015 Ram 3500 and 2016 Ram 2500. Also, before buying the 2015 Ram 3500 and 2016 Ram 2500, he reviewed and relied on information set forth in the Monroney sticker affixed to the 2015 Ram 3500 and 2016 Ram 2500's window, including talking to dealership personnel, and taking a test drive.

73.     Mr. Chapman did not know at the time he bought the 2015 Ram 3500 and 2016 Ram 2500 that the trucks were equipped with illegal emissions control software defeat devices designed to cheat emission tests, and that it could perform as advertised only by emitting pollutants, such as NOx, at levels that are above legal limits, greater than what was advertised, and greater than emissions emitted from gasoline-powered vehicles.

CLASS ACTION COMPLAINT
CASE NO.

74. Mr. Chapman has suffered a concrete injury as a direct and proximate result of Defendants' unlawful conduct. Had Defendants not concealed the emissions control software defeat devices and disclosed that the Class Vehicles could perform as advertised only by emitting pollutants at unlawful levels, Mr. Chapman would have seen and reviewed such disclosures and would not have purchased the 2015 Ram 3500 and 2016 Ram 2500, or would have paid less for them. Mr. Chapman would also not have paid the premium charged for the 2015 Ram 3500 and 2016 Ram 2500 versus a comparable gasoline-powered truck.

## CLASS ACTION ALLEGATIONS

75. Pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following proposed classes of persons, initially defined as:

All persons or entities who, as of December 23, 2023, bought or leased a Class Vehicle in the United States ("Nationwide Class"); and

All persons or entities who, as of December 23, 2023, bought or leased a Class Vehicle in California ("California Class").

76. Members of the Nationwide Class and the California Class are collectively referred to herein as the "Class" or "Class members," unless otherwise stated. Excluded from the proposed Class are Defendants; any affiliate, parent, or subsidiary of Defendants; any entity in which Defendants have a controlling interest; any officer, director, or employee of Defendants; any successor or assign of Defendants; any judge to whom this case is assigned and any member of his or her immediate family; and any individuals who have personal injury claims resulting from the high emissions in the Class Vehicles.

77. Plaintiffs reserve their right to revise the class definitions after having any opportunity to conduct discovery and further investigation.

78. Members of the proposed Class are readily ascertainable because the class definition is based on objective criteria.

79. **Numerosity**. Defendants have sold many thousands of Class Vehicles, including a substantial number in California. Members of the proposed Class likely number in the thousands and are

CLASS ACTION COMPLAINT
CASE NO.

thus too numerous to practically join in a single action. Class members may be notified of the pendency of this action by mail, supplemented by published notice (if deemed necessary or appropriate by the Court).

80. **Commonality and Predominance**. Common questions of law and fact exist as to all proposed Class members and predominate over questions affecting only individual class members. These common questions include, but are not limited to:

      a.    Whether Defendants installed emissions control software defeat devices in Class Vehicles;

      b.    Whether Defendants had a duty to disclose the existence of the emissions control software defeat device and its consequences to its customers;

      c.    Whether Defendants' marketing of Class Vehicles was likely to deceive or mislead consumers;

      d.    Whether the existence of the emissions control software defeat device and its consequences would be considered material by reasonable consumers;

      e.    Whether the alleged misconduct violates any applicable warranties; and

      f.    Whether Defendants' conduct injured Plaintiffs and the members of the proposed Class.

81. **Typicality**. Plaintiffs' claims are typical of the claims of the proposed Class. Plaintiffs and members of the proposed Class all purchased or leased Class Vehicles that contain the same defeat device, giving rise to substantially the same claims.

82. **Adequacy**. Plaintiffs are adequate representatives of the proposed Class because their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation and will prosecute this action vigorously on Class members' behalf.

83. **Superiority**. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Even if Class members themselves could afford such individualized

litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the defeat devices, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

84.     In the alternative, the proposed Class may be certified because:

a.      the prosecution of separate actions by the individual members of the proposed class(es) would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Defendants;

b.      the prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of the interests of non-party class members or which would substantially impair their ability to protect their interests; and

c.      Defendants have acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final and injunctive relief with respect to the members of the proposed class(es) as a whole.

## TOLLING OF STATUTE OF LIMITATIONS

85.     **Discovery Rule**. Plaintiffs' and Class members' claims accrued upon discovery of the defeat devices in their Class Vehicles, which was not publicly disclosed until December 2023 at the earliest. While Defendants knew, and concealed, the facts that the Class Vehicles have the defeat devices that misrepresented the true emissions of the Class Vehicles, Plaintiffs and Class members could not and did not discover these facts sooner through reasonable diligent investigation.

86.     **Active Concealment Tolling**. Any statutes of limitations are tolled by Defendants' knowing and active concealment of the defeat devices in the Class Vehicles. Defendants kept Plaintiffs and all Class members ignorant of vital information essential to the pursuit of their claim, without any fault or lack of diligence on the part of Plaintiffs. The details of Defendants' efforts to conceal the above-described unlawful conduct are in their possession, custody, and control, to the exclusion of Plaintiffs

CLASS ACTION COMPLAINT
CASE NO.

and Class members, and await discovery. Plaintiffs could not reasonably have discovered the defeat devices in their Class Vehicles.

87. **Estoppel**. Defendants were and are under a continuous duty to disclose to Plaintiffs and all Class members the true character, quality, and nature of the defeat devices in the Class Vehicles. At all relevant times, and continuing to this day, Defendants knowingly, affirmatively, and actively concealed the true character, quality, and nature of the defeat devices Defendants installed in the Class Vehicles. The details of Defendants' efforts to conceal the above-described unlawful conduct are in their possession, custody, and control, to the exclusion of Plaintiffs and Class members, and await discovery. Plaintiffs reasonably relied upon Defendants' active concealment. Based on the foregoing, Defendants are estopped from relying upon any statutes of limitation in defense of this action.

88. **Equitable Tolling**. Defendants took active steps to conceal the fact that they wrongfully, improperly, illegally, and repeatedly manufactured, marketed, distributed, sold, and leased Class Vehicles with the defeat devices. The details of Defendants' efforts to conceal their above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class members, and await discovery. When Plaintiffs learned about this material information, they exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing their claims. Should such tolling be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of the California Unfair Competition Law**
**(Cal. Bus. & Prof. Code § 17200, *et seq*.)**
**(All Plaintiffs individually and on behalf of the proposed California Class)**

89. Plaintiffs re-allege the paragraphs above as if fully set forth herein.

90. Plaintiffs bring this claim on behalf of themselves and on behalf of the California Class against Defendants.

91. Defendants' acts and practices, as alleged in this complaint, constitute unlawful, unfair, and fraudulent business practices, in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.

CLASS ACTION COMPLAINT
CASE NO.

92.     Defendants' business acts and practices are unlawful in that they violate the Consumers Legal Remedies Act, Cal. Civil Code § 1750, *et seq.*, the False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*, the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, *et seq.*; and vehicle emissions laws under California law.

93.     Defendants' acts and practices also constitute fraudulent practices in that they are likely to deceive reasonable consumers. As described above, Defendants knowingly concealed and failed to disclose at the point of sale and otherwise, the following facts: (1) that the Class Vehicles have the emissions control software defeat devices; (2) the true nature of the Class Vehicles' emissions, performance, fuel economy, and other material features; (3) the Class Vehicles lack of compliance with federal and California emissions regulations; and (4) when the Class Vehicles are driven during normal conditions, the illegal emission control devices reduced the effectiveness of the emission control system, resulting in increased pollution. Had Defendants disclosed these facts, Plaintiffs would have been aware of them and would not have purchased or leased the Class Vehicles or would have paid less for them.

94.     Defendants' conduct also constitutes unfair business practices for at least the following reasons: (a) the gravity of harm to Plaintiffs and the proposed Class from Defendants' acts and practices far outweighs any legitimate utility of that conduct; (b) the conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and members of the proposed Class; (c) the injury is not one that consumers reasonably could have avoided; (d) the conduct undermines or violates the stated public policies underlying the laws alleged herein.

95.     As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices, Plaintiffs and the proposed Class members suffered injury in fact and lost money or property, because they purchased or leased Class Vehicles that they otherwise would not have, or in the alternative, would have paid less for, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. In addition, Plaintiffs and the proposed Class will incur additional fuel costs, and a diminution in the performance of their respective Class Vehicles, if and when their Class Vehicles are adjusted in order to bring them into compliance with federal and state emissions standards.

96.     Plaintiffs and the proposed Nationwide Class members are entitled to equitable relief, including restitution to compensate Plaintiffs and the Class as a result of Defendants' unlawful, unfair

CLASS ACTION COMPLAINT
CASE NO.

and deceptive, and fraudulent practices, and an injunction enjoining Defendants' misconduct as alleged herein and directing Defendants to disclose the existence of the emissions control software defeat devices to all owners and lessees of the Class Vehicles and directing Defendants to provide an adequate repair. Plaintiffs, the Class, and members of the public will suffer irreparable injury if an injunction is not ordered because they are at risk of incurring additional fuel costs, and a diminution in the performance of their respective Class Vehicles, if and when their Class Vehicles are adjusted in order to bring them into compliance with federal and state emissions standards. Plaintiffs and Class members will also suffer irreparable injury if Defendants' misleading practices are not enjoined. They have an interest in buying vehicles in the future, often see marketing for Defendants vehicles and diesel engines, and will consider purchasing FCA's vehicles equipped with the Cummins diesel engine in the future if possible, but have no way of determining whether the vehicles with the Cummins diesel engine are installed with emissions control software defeat devices.

97.     Plaintiffs bring this claim on behalf of the Class in the alternative to any claims brought for legal remedies and expressly allege that for purposes of this claim they lack adequate remedies at law. In addition, the restitution that may be available under this claim, including for restitutionary disgorgement of revenues attributable to an increased volume of vehicle sales made possible by the challenged practices, may not be recoverable as damages or otherwise at law. Plaintiffs, individually and as members of the Class, have no adequate remedy at law for the future unlawful acts, methods, or practices as set forth above absent an injunction. Moreover, Defendants' alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to prevent.

### SECOND CAUSE OF ACTION
**Violations of the California Consumers Legal Remedies Act**
**(Cal. Civ. Code § 1750, *et seq.*)**
**(All Plaintiffs individually and on behalf of the proposed California Class)**

98.     Plaintiffs re-allege the paragraphs above as if fully set forth herein.

99.     Plaintiffs bring this claim on behalf of themselves and on behalf of the California Class against Defendants.

CLASS ACTION COMPLAINT
CASE NO.

100.    Defendants are "persons" within the meaning of Civil Code §§ 1761(c) and 1770 and have provided "goods" within the meaning of Civil Code §§ 1761(a) and 1770.

101.    Plaintiffs and members of the proposed Nationwide Class are "consumers" within the meaning of Civil Code §§ 1761(d) and 1770 and their purchases or leases of the Class Vehicles constitute a "transaction" within the meaning of Civil Code §§ 1761(e) and 1770.

102.    Defendants' acts and practices, which were intended to result, and which did result in the sale or lease of Class Vehicles with emissions control software defeat devices, violate § 1770 of the Consumers Legal Remedies Act (CLRA) for at least the following enumerated CLRA provisions:

            a.      Misrepresenting the approval or certification of goods. Cal. Civ. Code § 1770(a)(2).

            b.      Misrepresenting the certification by another. Cal. Civ. Code § 1770(a)(3).

            c.      Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have. Cal. Civ. Code § 1770(a)(5).

            d.      Representing that goods are of a particular standard, quality, or grade, if they are of another. Cal. Civ. Code § 1770(a)(7).

            e.      Advertising goods with intent not to sell them as advertised. Cal. Civ. Code § 1770(a)(9).

            f.      Representing that goods have been supplied in accordance with a previous representation when they have not. Cal. Civ. Code § 1770(a)(16).

103.    As described above, Defendants sold the Class Vehicles to Plaintiffs and Class members but failed to disclose the emissions control software defeat devices at the point of sale, advertising materials, or otherwise. Defendants intended that Plaintiffs and the members of the proposed Class rely on the omission in deciding to purchase their vehicles.

104.    Had Defendants adequately disclosed the emissions control software defeat devices at the point of sale and in advertising materials, Plaintiffs, members of the proposed Class, and reasonable consumers would not have purchased or lease the Class Vehicles or would have paid less to buy or lease them.

CLASS ACTION COMPLAINT
CASE NO.

105. Plaintiffs disclaim any request for monetary relief, including punitive damages, under the Consumer Legal Remedies Act at this time but reserve the right to seek such relief after providing Defendants with the notice required by the Act.

106. Pursuant to California Civil Code § 1780, Plaintiffs seek all available injunctive relief. Plaintiffs and the proposed Nationwide Class members are entitled to an injunction enjoining Defendants' misconduct as alleged herein and directing Defendants to disclose the existence of the emissions control software defeat devices to all owners and lessees of the Class Vehicles and directing Defendants to provide an adequate repair. Plaintiffs, the Class, and members of the public will suffer irreparable injury if an injunction is not ordered because they are at risk of incurring additional fuel costs, and a diminution in the performance of their respective Class Vehicles, if and when their Class Vehicles are adjusted in order to bring them into compliance with federal and state emissions standards. Plaintiffs and Class members will also suffer irreparable injury if Defendants' misleading practices are not enjoined. They have an interest in buying vehicles in the future, often see marketing for Defendants vehicles and diesel engines, and will consider purchasing FCA's vehicles equipped with the Cummins diesel engine in the future if possible, but have no way of determining whether the vehicles with the Cummins engine are installed with emissions control software defeat devices.

107. Plaintiffs bring this claim on behalf of the Class in the alternative to any claims brought for legal remedies and expressly allege that for purposes of this claim they lack adequate remedies at law. Plaintiffs, individually and as members of the Class, have no adequate remedy at law for the future unlawful acts, methods, or practices as set forth above absent an injunction. Moreover, Defendants' alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to prevent.

### THIRD CAUSE OF ACTION
**Violation of the California False Advertising Law**
**(Cal. Civ. Code § 17500, *et seq.*)**
**(All Plaintiffs individually and on behalf of the proposed California Class)**

108. Plaintiffs re-allege the paragraphs above as if fully set forth herein.

109. Plaintiffs bring this claim on behalf of themselves and on behalf of the California Class against Defendants.

110. California Bus. & Prof. Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

111. Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs and Class members.

112. Defendants have violated § 17500 because their promises of performance, fuel efficiency, functionality, reliability, and safety, of the Class Vehicles as set forth in this Complaint were misleading in light of the failure to disclose the material facts set forth herein, and thus, Defendants' representations and promises were likely to deceive a reasonable consumer, such as Plaintiffs and the proposed Class.

113. Plaintiffs and Class members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiffs and Class member relied on the misrepresentations and/or omissions of Defendants with respect to the performance, fuel efficiency, functionality, reliability, and safety, of the Class Vehicles. Defendants' representations turned out not to be true because the Class Vehicles were and are distributed with emissions control software defect devices that circumvent emission standards. The software defeat devices enabled the Class Vehicles to pass standard EPA emissions tests but artificially reduced the effectiveness of the emission controls and during normal driving conditions outside testing standards increased pollution. Had Defendants disclosed these facts, through Defendants' advertising, marketing, and other publications, such as their websites, the Class Vehicle brochures, and/or on the Monroney sticker, Plaintiffs, Class members, and reasonable consumers would not have purchased or leased the Class Vehicles or would have paid less for them. Also, Plaintiffs and the proposed Class will incur additional fuel costs, and a diminution in the performance of their respective Class Vehicles, if and when

their Class Vehicles are adjusted in order to bring them into compliance with federal and state emissions standards. Accordingly, Plaintiffs and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

114. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' businesses. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

115. Plaintiffs, individually and on behalf of the Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to the Plaintiffs and the Class members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief permitted.

116. Plaintiffs and the proposed Class members are entitled to equitable relief, including restitution to compensate Plaintiffs and the Class as a result of Defendants' unlawful, unfair and deceptive, and fraudulent practices, and an injunction enjoining Defendants' misconduct as alleged herein and directing Defendants to disclose the existence of the emissions control software defect devices to all owners and lessees of the Class Vehicles and directing Defendants to provide an adequate repair. Plaintiffs, the Class, and members of the public will suffer irreparable injury if an injunction is not ordered because they are at risk of incurring additional fuel costs, and a diminution in the performance of their respective Class Vehicles, if and when their Class Vehicles are adjusted in order to bring them into compliance with federal and state emissions standards. Plaintiffs and Class members will also suffer irreparable injury if Defendants' misleading practices are not enjoined. They have an interest in buying vehicles in the future, often see marketing for Defendants vehicles and diesel engines, and will consider purchasing FCA's vehicles equipped with the Cummins diesel engine in the future if possible, but have no way of determining whether the vehicles with the Cummins engine are installed with emissions control software defeat devices.

117. Plaintiffs bring this Claim on behalf of the Class in the alternative to any Claims brought for legal remedies and expressly allege that for purposes of this Claim they lack adequate remedies at law. In addition, the restitution that may be available under this claim, including for restitutionary

CLASS ACTION COMPLAINT
CASE NO.

disgorgement of revenues attributable to an increased volume of vehicle sales made possible by the challenged practices, may not be recoverable as damages or otherwise at law. Plaintiffs, individually and as members of the Class, have no adequate remedy at law for the future unlawful acts, methods, or practices as set forth above absent an injunction. Moreover, Defendants' alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to prevent.

### FOURTH CAUSE OF ACTION
**Breach of Express Warranty**
**(Cal. Com. Code §§ 2313 and 10210)**
**(All Plaintiffs individually and on behalf of the proposed California Class)**

118.    Plaintiffs re-allege the paragraphs above as if fully set forth herein.

119.    Plaintiffs bring this claim on behalf of themselves and on behalf of the California Class against Defendant FCA.

120.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

121.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

122.    Plaintiffs and Class members who purchased Class Vehicles are "buyer[s]" within the meaning of Cal. Com. Code § 2103(1)(a), or who leased Class Vehicles are "lessee[s]" within the meaning of Cal. Com. Code § 10103(a)(14).

123.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

124.    In connection with the purchase or lease of the Class Vehicles, FCA provided Plaintiffs and Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship. FCA also provides for their light-duty trucks, pursuant to

the Clean Air Act and the EPA, two federal emission control warranties: (1) "Performance Warranty" and (2) "Design and Defect Warranty."[1]

125.    The Performance Warranty applies to repairs which are required during the first 2 years or 24,000 miles of vehicle use (whichever first occurs) because the vehicle failed an emission test. Certain major emission control components are covered for the first 8 years or 80,000 miles (whichever first occurs). The major emission control components are the catalytic converters, the electronic emissions control unit or computer (ECU), and the onboard emissions diagnostic (OBD) device or computer. [2]

126.    The Design and Defect Warranty applies to repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship for 2 years or 24,000 miles (whichever first occurs), and for the major emissions control components, for 8 years or 80,000 miles (whichever first occurs).[3]

127.    FCA also provides an express warranty to Plaintiffs and the proposed Class, through 40 C.F.R. § 1037.20, that the design and manufacture of the Class Vehicles, including all part of its emission control system, are free from defects in materials and workmanship for five years or 50,000 miles, whichever comes first, for light-duty vehicles; and for 5 years or 100,000 miles, whichever comes first, for medium- and heavy-duty vehicles.

128.    FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and Class members unknowingly purchased or leased the Class Vehicles with the emissions control software defeat devices. However, FCA knew or should have known that the warranties were false and/or misleading. Specifically, FCA was aware of the emissions control software defeat devices in the Class Vehicles at the time that they were sold and leased to Plaintiffs and Class members. FCA knew about the emissions control software defeat devices for years, as alleged herein, and yet chose to conceal it and ignore its warranty obligations.

---

[1] *See* https://www.epa.gov/transportation-air-pollution-and-climate-change/frequent-questions-related-transportation-air#:~:text=The%20Clean%20Air%20Act%20requires, to%20used%20vehicles %20as%20well. (last visited Jan. 27, 2024).
[2] *Id.*
[3] *Id.*

CLASS ACTION COMPLAINT
CASE NO.

129.    FCA failed to inform Plaintiffs and Class members that the Class Vehicles were defectively designed and manufactured to circumvent emission standards, and when driven during normal conditions, the illegal emission control devices reduced the effectiveness of the emission control system, resulting in increased pollution. Accordingly, the design and manufacture of the Class Vehicles are not free from defects as expressly warranted by FCA.

130.    Plaintiffs and Class members reasonably relied on FCA's express warranties when purchasing or leasing their Class Vehicles.

131.    FCA knowingly breached its express warranties to repair and correct defects in materials and workmanship by not repairing or adjusting the defects in the Class Vehicles and is unable to do so without adversely affecting the performance and fuel efficiency of the Class Vehicles. FCA also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiffs and Class members. Plaintiffs and Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

132.    Furthermore, the limited warranty promising to repair and correct the defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

133.    Accordingly, recovery by Plaintiffs and Class members is not restricted to the limited warranty promising to repair and correct the defect in materials and workmanship, and they seek all remedies as allowed by law, the revocation of acceptance of goods and the return to FCA the purchase or lease of all Class Vehicles currently owned or leased, and for other incidental and consequential damages.

134.    As a direct and proximate result of FCA's breach of its express warranties, Plaintiffs and Class members bought or leased the Class Vehicles they otherwise would not have, overpaid for their vehicles, received goods whose defect substantially impairs their value, and did not receive the benefit of their bargain.

135.    Any attempt by FCA to disclaim or limit these express warranties are unconscionable and unenforceable because FCA knowingly sold defective vehicles without disclosing to consumers about

CLASS ACTION COMPLAINT
CASE NO.

the emissions control software defeat devices. In addition, the time limits in FCA's warranties were also unconscionable and inadequate because Plaintiffs and Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favor FCA. Since FCA knew or should have known that the Class Vehicles were inherently defective and did not conform to the warranties at the time of sale, a gross disparity in bargaining power at contract formation existed between FCA and Plaintiffs and Class members.

136.    FCA was provided notice of the emissions control software defeat devices in 2015 when the EPA warned manufacturers that it planned to test vehicles to identify illegal cheat devices that skirt emission standards and exceed pollution limits, including recent federal and California government investigations. Despite the EPA's warnings and concerted efforts to stamp out the use of defeat devices and emissions cheating, including the record-setting fines and settlements paid by Volkswagen, FCA continued with the installation of defeat devices in the Class Vehicles. Thus, affording FCA a reasonably opportunity to cure their breach of written warranties would be unnecessary and futile.

137.    Plaintiffs and Class members complied with all obligations under the warranties, or otherwise are excused from performance of such obligations because of FCA's conduct alleged herein.

## FIFTH CAUSE OF ACTION
### Violation of the Song-Beverly Consumer Warranty Act for Breach of Express Warranties
### (Cal. Civ. Code § 1790, *et seq.*)
### (All Plaintiffs individually and on behalf of the proposed California Class)

138.    Plaintiffs re-allege the paragraphs above as if fully set forth herein.

139.    Plaintiffs bring this claim on behalf of themselves and on behalf of the California Class against Defendant FCA.

140.    FCA is and was at all relevant times a "manufacturer" of the Class Vehicles within the meaning of California Civil Code § 1791(j).

141.    FCA is and was at all relevant times a "seller" of motor vehicles under California Civil Code § 1791(l).

142.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under California Civil Code § 1791(i).

CLASS ACTION COMPLAINT
CASE NO.

143.     Plaintiffs and Class members who purchased Class Vehicles sold in California are "buyer[s]" within the meaning of California Civil Code § 1791(b), or who leased Class Vehicles sold in California are "lessees" within the meaning of California Civil Code § 1791(h).

144.     The Class Vehicles are "consumer goods" within the meaning of California Civil Code § 1791(a).

145.     The Song-Berly Consumer Warranty Act applies to "consumer goods sold in this state[.]" Cal. Civ. Code § 1793.2.

146.     The Class Vehicles were also sold in California by FCA. Plaintiffs' vehicles were sold in California.

147.     FCA made express warranties to Plaintiffs and Class members within the meaning of California Civil Code §§ 1791.2 and 1793.2, as alleged herein.

148.     In connection with the purchase or lease of the Class Vehicles, FCA provided Plaintiffs and Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship. FCA also provides for their light-duty trucks, pursuant to the Clean Air Act and the EPA, two federal emission control warranties: (1) "Performance Warranty" and (2) "Design and Defect Warranty."[4]

149.     The Performance Warranty applies to repairs which are required during the first 2 years or 24,000 miles of vehicle use (whichever first occurs) because the vehicle failed an emission test. Certain major emission control components are covered for the first 8 years or 80,000 miles (whichever first occurs). The major emission control components are the catalytic converters, the electronic emissions control unit or computer (ECU), and the onboard emissions diagnostic (OBD) device or computer. [5]

150.     The Design and Defect Warranty applies to repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship for

---

[4] *See* https://www.epa.gov/transportation-air-pollution-and-climate-change/frequent-questions-related-transportation-air#:~:text=The%20Clean%20Air%20Act%20requires, to%20used%20vehicles%20as%20well. (last visited Jan. 27, 2024).
[5] *Id.*

2 years or 24,000 miles (whichever first occurs), and for the major emissions control components, for 8 years or 80,000 miles (whichever first occurs).[6]

151. FCA also provides an express warranty to Plaintiffs and the proposed Class, through 40 C.F.R. § 1037.20, that the design and manufacture of the Class Vehicles, including all part of its emission control system, are free from defects in materials and workmanship for five years or 50,000 miles, whichever comes first, for light-duty vehicles; and for 5 years or 100,000 miles, whichever comes first, for medium- and heavy-duty vehicles.

152. FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and Class members unknowingly purchased or leased the Class Vehicles that came equipped with the emissions control software defeat devices. However, FCA knew or should have known that the warranties were false and/or misleading. Specifically, FCA was aware of the emissions control software defeat devices in the Class Vehicles at the time that they were sold and leased to Plaintiffs and Class members. FCA knew about the emissions control software defeat devices for years, as early as 2015, as alleged herein, and yet chose to conceal it and ignore their warranty obligations.

153. FCA failed to inform Plaintiffs and Class members that the Class Vehicles were defectively designed and manufactured to circumvent emission standards, and when driven during normal conditions, the illegal emission control devices reduced the effectiveness of the emission control system, resulting in increased pollution. Accordingly, the design and manufacture of the Class Vehicles are not free from defects as expressly warranted by FCA.

154. Plaintiffs and Class members reasonably relied on FCA's express warranties when purchasing or leasing their Class Vehicles.

155. FCA knowingly breached its express warranties to repair and correct defects in materials and workmanship by not repairing or adjusting the defects in the Class Vehicles and is unable to do so without adversely affecting the performance and fuel efficiency of the Class Vehicles. FCA also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiffs

---

[6] *Id.*

CLASS ACTION COMPLAINT
CASE NO.

and Class members. Plaintiffs and Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

156. Furthermore, the limited warranty promising to repair and correct the defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

157. Accordingly, recovery by Plaintiffs and Class members is not restricted to the limited warranty promising to repair and correct the defect in materials and workmanship, and they seek all remedies as allowed by law.

158. As a direct and proximate result of FCA's breach of its express warranties, Plaintiffs and Class members bought or leased the Class Vehicles they otherwise would not have, overpaid for their vehicles, received goods whose defect substantially impairs their value, and did not receive the benefit of their bargain.

159. Any attempt by FCA to disclaim or limit these express warranties are unconscionable and unenforceable because FCA knowingly sold a defective product without disclosing to consumers the emissions control software defeat devices. In addition, the time limits in FCA's warranties were also unconscionable and inadequate because Plaintiffs and Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favor FCA. Since FCA knew or should have known that the Class Vehicles were inherently defective and did not conform to the warranties at the time of sale, a gross disparity in bargaining power at contract formation existed between FCA and Plaintiffs and Class members.

160. Pursuant to Cal. Civ. Code §§ 1793.2 and 1794, Plaintiffs and Class members are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their Class Vehicles, the overpayment or diminution in value of their Class Vehicles, the revocation of acceptance of goods and the return to FCA the purchase or lease of all Class Vehicles currently owned or leased, and/or for other incidental and consequential damages.

161. Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the proposed Class are entitled to costs and attorneys' fees.

## SIXTH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability
### (Cal. Com. Code §§ 2314 and 10212)
### (All Plaintiffs individually and on behalf of the proposed California Class)

162.    Plaintiffs re-allege the paragraphs above as if fully set forth herein.

163.    Plaintiffs bring this claim on behalf of themselves and on behalf of the California Class against Defendant FCA.

164.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles, Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

165.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

166.    Plaintiffs and Class members who purchased Class Vehicles are "buyer[s]" within the meaning of Cal. Com. Code § 2103(1)(a), or who leased Class Vehicles are "lessee[s]" within the meaning of Cal. Com. Code § 10103(a)(14).

167.    The Class Vehicles were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

168.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

169.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.

170.    The Class Vehicles would not pass without objection in the automotive trade due to the emissions control software defeat devices designed to circumvent emission standards, and when driven during normal conditions, the illegal emission control devices reduced the effectiveness of the emission control system, resulting in increased pollution, and therefore were not in merchantable condition and not fit for the ordinary purpose for which vehicles are used.

171.    The Class Vehicles were and are not adequately labeled because the labeling fails to disclose the emissions control software defeat devices in the Class Vehicles.

172.    In the various channels of information through which FCA sold, leased, and marketed Class Vehicles, FCA failed to disclose material information concerning the emissions control software defeat devices in the Class Vehicles, which it had to duty to disclose. FCA had a duty to disclose the emissions control software defeat devices because, as alleged herein: (a) FCA knew about the emissions control software defeat devices for years, as early as 2015, and yet chose to conceal it; (b) FCA had exclusive knowledge of material facts not known to the general public or Class members, including Plaintiffs; (c) FCA actively concealed material facts from the general public and Class members, including Plaintiffs, concerning the emissions control software defeat devices in the Class Vehicles; and (d) FCA made partial representations about the Class Vehicles that were misleading because it did not disclose the full truth. As alleged herein, FCA knew the information concerning the emissions control software defeat devices at the time of advertising and selling the Class Vehicles, all of which intended to induce consumers to purchase the Class Vehicles.

173.    Plaintiffs and Class members relied on and/or reviewed and viewed statements or advertisements, such as FCA's website, Class Vehicle brochures, and/or the Monroney sticker, made by FCA in choosing to purchase or lease a Class Vehicle.

174.    FCA breached the implied warranty of merchantability by manufacturing and selling Class Vehicles that are defective. Furthermore, the emissions control software defeat devices have caused Class members, including Plaintiffs, to not receive the benefit of their bargain and have caused the Class Vehicles to depreciate in value.

175.    Plaintiffs and Class members have been damaged as a result of the diminished value of FCA's products.

176.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and Class members have been damaged in an amount to be proven at trial.

177.    FCA was provided notice of the emissions control software defeat devices in 2015 when the EPA warned manufacturers that it planned to test vehicles to identify illegal cheat devices that skirt emission standards and exceed pollution limits, including recent federal and California government investigations. Despite the EPA's warnings and concerted efforts to stamp out the use of defeat devices and emissions cheating, including the record-setting fines and settlements paid by Volkswagen, FCA

CLASS ACTION COMPLAINT
CASE NO.

continued to install defeat devices in the Class Vehicles. Thus, affording FCA a reasonably opportunity to cure their breach of written warranties would be unnecessary and futile.

178.    Plaintiffs and Class members have had sufficient direct dealings with FCA, including their agents (*e.g.*, authorized dealerships, Consumer Affairs departments, and technical support) to establish privity of contract between FCA on the one hand, and Plaintiffs and each of the other Class members on the other hand. Alternatively, the privity requirement is excepted here because, as alleged herein, Plaintiffs and Class members relied on and/or reviewed and viewed statements or advertisements, such as FCA's websites, Class Vehicle brochures, and/or the Monroney sticker, made by FCA in choosing to purchase or lease a Class Vehicle. *See Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) (identifying specific exceptions to the privity rule under California law – "[t]he first arises when the plaintiff relies on written labels or advertisement of a manufacturer.").

## SEVENTH CAUSE OF ACTION
### Violation of the Song-Beverly Consumer Warranty Act for Breach of Implied Warranty of Merchantability
### (Cal. Civ. Code § 1790, *et seq.*)
### (All Plaintiffs individually and on behalf of the proposed California Class)

179.    Plaintiffs re-allege the paragraphs above as if fully set forth herein.

180.    Plaintiffs bring this claim on behalf of themselves and on behalf of the California Class against Defendant FCA.

181.    FCA is and was at all relevant times a "manufacturer" of the Class Vehicles within the meaning of California Civil Code § 1791(j).

182.    FCA is and was at all relevant times a "seller" of motor vehicles under California Civil Code § 1791(l).

183.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under California Civil Code § 1791(i).

184.    Plaintiffs and Class members who purchased Class Vehicles sold in California are "buyer[s]" within the meaning of California Civil Code § 1791(b), or who leased Class Vehicles sold in California are "lessees" within the meaning of California Civil Code § 1791(h).

185.    The Class Vehicles are "consumer goods" within the meaning of California Civil Code § 1791(a).

CLASS ACTION COMPLAINT
CASE NO.

186. The Song-Beverly Consumer Warranty Act applies to "consumer goods that are sold at retail in this state[.]" Cal. Civ. Code §§ 1792.

187. The Class Vehicles were also sold at retail in California by FCA. Plaintiffs' vehicles were sold at retail in California.

188. FCA impliedly warranted to Plaintiffs and Class members that their Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792, however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

189. Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1) Pass without objection in the trade under the contract description.

(2) Are fit for the ordinary purposes for which such goods are used.

(3) Are adequately contained, packaged, and labeled.

(4) Conform to the promises or affirmations of fact made on the container or label.

190. The Class Vehicles would not pass without objection in the automotive trade due to the emissions control software defeat devices designed to circumvent emission standards, and when driven during normal conditions, the illegal emission control devices reduced the effectiveness of the emission control system, resulting in increased pollution, and therefore were not in merchantable condition and not fit for the ordinary purpose for which vehicles are used.

191. The Class Vehicles were and are not adequately labeled because the labeling fails to disclose the emissions control software defeat devices in the Class Vehicles.

192. In the various channels of information through which FCA sold, leased, and marketed Class Vehicles, FCA failed to disclose material information concerning the emissions control software defeat devices in the Class Vehicles, which it had to duty to disclose. FCA had a duty to disclose the emissions control software defeat devices because, as alleged herein: (a) FCA knew about the emissions control software defeat devices for years, as early as 2015, and yet chose to conceal it; (b) FCA had exclusive knowledge of material facts not known to the general public or Class members, including Plaintiffs; (c) FCA actively concealed material facts from the general public and Class members, including Plaintiffs, concerning the emissions control software defeat devices in the Class Vehicles; and

CLASS ACTION COMPLAINT
CASE NO.

(d) FCA made partial representations about the Class Vehicles that were misleading because it did not disclose the full truth. As alleged herein, FCA knew the information concerning the emissions control software defeat devices at the time of advertising and selling the Class Vehicles, all of which intended to induce consumers to purchase the Class Vehicles.

193. Plaintiffs and Class members relied on and/or reviewed and viewed statements or advertisements, such as FCA's website, Class Vehicle brochures, and/or the Monroney sticker, made by FCA in choosing to purchase or lease a Class Vehicle.

194. FCA breached the implied warranty of merchantability by manufacturing and selling Class Vehicles that are defective. Furthermore, the emissions control software defeat devices have caused Class members, including Plaintiffs, to not receive the benefit of their bargain and have caused the Class Vehicles to depreciate in value.

195. Plaintiffs and Class members have been damaged as a result of the diminished value of Defendant's vehicles.

196. Plaintiffs and Class members have had sufficient direct dealings with FCA, including their agents (*e.g.*, authorized dealerships, Consumer Affairs departments, and technical support) to establish privity of contract between FCA on the one hand, and Plaintiffs and each of the other Class members on the other hand. Alternatively, the privity requirement is excepted here because, as alleged herein, Plaintiffs and Class members relied on and/or reviewed and viewed statements or advertisements, such as FCA's websites, Class Vehicle brochures, and/or the Monroney sticker, made by FCA in choosing to purchase or lease a Class Vehicle. *See Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) (identifying specific exceptions to the privity rule under California law – "[t]he first arises when the plaintiff relies on written labels or advertisement of a manufacturer.").

197. Pursuant to Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiffs and Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

198. Under Cal. Civ. Code § 1794, Plaintiffs and the other members of the Class are entitled to costs and attorneys' fees.

CLASS ACTION COMPLAINT
CASE NO.

**EIGHTH CAUSE OF ACTION**
**Breach of Express California Emissions Warranty**
**(Cal. Civ. Code § 1793.2, *et seq.*)**
**(All Plaintiffs individually and on behalf of the proposed California Class)**

199.   Plaintiffs re-allege the paragraphs above as if fully set forth herein.

200.   Plaintiffs bring this claim on behalf of themselves and on behalf of the California Class against Defendant FCA.

201.   Each Class Vehicle is covered by California's express Emissions Warranty.[7]

202.   The California Emissions Warranty state that "[t]he manufacturer of each motor vehicle or motor vehicle engine shall warrant … that the vehicle or engine is "[d]esigned, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board."[8] This provision applies without any time or mileage limitation.[9]

203.   The California Emissions Warranty also specifically warrant consumers of light- and medium duty vehicles against any performance failure of the emissions control system for three years or 50,000 miles, whichever occurs first, and against any defect in any emission-related part for seven years or 70,000 miles, whichever occurs first,[10] and against any defect in any emission-related part for five years or 100,000 miles, whichever occurs first, for diesel-powered heavy-duty vehicles.[11]

204.   California law imposes certain duties "on the manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty."[12] Among those duties, "[i]f the manufacturer or its representative in this state is unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle or promptly make restitution to the buyer" at the vehicle owner's option.[13]

---

[7] *See* Cal. Health & Safety Code § 43205; Cal. Code Regs. tit. 13, § 2037.
[8] Cal. Code Regs. tit. 13, § 2037.
[9] *See id.*
[10] *See id.*
[11] Cal. Code Regs. tit. 13, § 2036.
[12] Cal. Civ. Code §1793.2
[13] *See* Cal. Civ. Code § 1793.2(d)(2).

205.    Plaintiffs and Class members are excused from the requirement to "deliver nonconforming goods to the manufacturer's service and repair facility within this state" because it is unnecessary and futile.[14] Accordingly, this Complaint serves as "written notice of nonconformity to [FCA]" and "shall constitute return of the goods."[15]

206.    Plaintiffs and Class members are excused from any requirement that they allow a "reasonable number of attempts" to bring Class Vehicles into conformity with their California Emissions Warranty based on futility because FCA has not repaired or adjusted the Class Vehicles' materials and workmanship defects, and is unable to do so without adversely affecting the performance and fuel efficiency of the Class Vehicles.

207.    In addition to all other damages and remedies, Plaintiffs and Class members are entitled to "recover a civil penalty of up to two times the amount of damages" for this violation.[16]

<u>**NINTH CAUSE OF ACTION**</u>
**Violation of the Racketeer Influenced and Corrupt Organizations Act**
**(18 U.S.C. § 1962(c)-(d))**
**(All Plaintiffs individually and on behalf of the proposed Nationwide Class)**

208.    Plaintiffs re-allege the paragraphs above as if fully set forth herein.

209.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against Defendants.

210.    Pursuant to 18 U.S.C. § 1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

211.    18 U.S.C. § 1964(c) provides for a civil remedy for any violation of 18 U.S.C. § 1962 for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter."

212.    Defendants are and were at all relevant times "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, a "legal or beneficial interest in property."

---

[14] Cal. Civ. Code § 1793.2(c).
[15] *Id.*
[16] *See* Cal. Civ. Code § 1794(e)(1).

213.     Defendants are liable under 18 U.S.C. § 1962(c) because they conducted or participated in the conduct of the affairs of an "association-in-fact enterprise" through a pattern of racketeering activity.

214.     As a direct and proximate result of their fraudulent scheme and common course of conduct as alleged in this Complaint, Defendants were able to extract billions of dollars from Plaintiffs and Class Members. As discussed in detail below, Defendants' years-long misconduct violated 18 U.S.C. § 1962(c) & (d).

215.     Defendants, at all relevant times, along with other individuals and entities, including unknown third parties involved in the design, manufacture, testing, and sale of the Class Vehicles and the Cummins engines therein, operated an association-in-fact enterprise engaged in interstate and foreign commerce, which was formed to obtain EPA Certificate of Conformity (COC), as well as CARB Executive Orders (EOs), to sell the Class Vehicles containing illegal emission control software defect devices throughout the United States. Through this fraudulent enterprise, Defendants conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4).

216.     Alternatively, each Defendant constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which Defendants conducted their pattern of racketeering activity in the United States.

217.     Defendants jointly designed, manufactured, and sold the Class Vehicles. FCA agreed to have Cummins obtain the COCs and the EOs through material misrepresentations and omissions to sell the Class Vehicles in the United States. Defendants participated in this fraudulent enterprise by designing, developing, supplying, and promoting the 6.7-liter diesel engine installed in all Class Vehicles.

218.     This fraudulent enterprise, at all relevant times, had an existence separate and distinct from each Defendant; was separate and distinct from the pattern of racketeering in which Defendants engaged; and was an ongoing organization consisting of legal entities, including Defendants, and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Class Vehicles through fraudulent COCs and EOs, false emissions tests, deceptive and misleading marketing and materials, and obtaining profits and revenues from those fraudulent activities.

CLASS ACTION COMPLAINT
CASE NO.

219. Each member of this fraudulent enterprise shared in the sales revenue generated by the enterprise's scheme to defraud consumers and franchise dealers alike nationwide and sharing the benefit of earning emissions "credits" as discussed below.

220. This fraudulent enterprise functioned by selling Class Vehicles to the consuming public. Through this fraudulent enterprise, Defendants and their co-conspirators engaged in a pattern of racketeering activity, namely a fraudulent scheme to increase profits for Defendants and other entities and individuals associated-in-fact with the enterprise's activities through the illegal scheme to sell the Class Vehicles.

221. Through this fraudulent enterprise, Defendants engaged in a pattern of racketeering activity to increase profits, and its activities affected, interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement, and sale and lease of the Class Vehicles in the United States, and the receipt of monies from the sale of the Class Vehicles, including to increase the emissions credits they earned, thereby allowing them to sell dirty vehicles as well, all for an additional profit.

222. There was a common communication network by which Defendants and their co-conspirators shared information on a regular basis. They used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Class Vehicles to the public nationwide.

223. Each participant in this fraudulent enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through this enterprise, Defendants functioned as a continuing unit to further the illegal scheme and their common purposes of increasing their profits and market share and minimizing losses.

224. As alleged herein, Defendants participated in the operation and management of this fraudulent enterprise by directing its affairs. While Defendants participated in, and are members of, this fraudulent enterprise, Defendants have a separate existence, including but not limited to individual personhood, legal statuses, different corporate offices and roles, financial accounts, officers, directors, and employees.

225. Defendants worked closely together to further their fraudulent enterprise by and among the following manner and means: (a) jointly planning to manufacture a diesel engine and truck that would

circumvent EPA and state emissions; (b) designing, manufacturing, distributing, and selling Class Vehicles that emit more pollution than allowed under applicable federal and state regulations; (c) misrepresenting and omitting vehicle specifications on COC and EO applications, thereby selling the Class Vehicles under fraudulently obtained COCs and EOs; (d) illegally selling and/or distributing Class Vehicles; (e) concealing the unlawfully high emissions of the Class Vehicles from government regulators and the public, including Plaintiffs and Class members; (f) misrepresenting or concealing the true nature and quality of the Class Vehicles; and (g) collecting profits from the sale of the Class Vehicles.

226. To carry out, and attempt to carry out, the scheme to defraud, Defendants, each of whom is a person associated in fact with the fraudulent enterprise, did knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c), by using mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) & 1343 (wire fraud).

227. Specifically, Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 & 1343), within the past ten years. The multiple acts of racketeering activity were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." Defendants engaged in racketeering activity by regular use of the facilities, services, distribution channels, and employees of the fraudulent enterprise. Defendants knowingly and intentionally participated in the scheme to defraud by using mail, telephone, and the internet to transmit mailings and wires in interstate or foreign commerce.

228. Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and Class members or to obtain money from Plaintiffs and Class member using materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

229. Defendants' predicate acts of racketeering, 18 U.S.C. § 1961(1), include but are not limited to, mail fraud or wire fraud.

230. For mail fraud, Defendants violated 18 U.S.C. § 1341 by sending and receiving, and by causing to be sent and/or received, materials via U.S. Mail or commercial interstate carriers for the

purpose of executing the unlawful scheme to design, manufacture, market, and sell the Class Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

231. For wire fraud, Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire to execute the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

232. Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, and shipment of the following by Defendants or third parties: the Class Vehicles and components, including the emissions control software defect devices; false and misleading emissions tests; fraudulent applications for COCs and EOs submitted to the EPA and CARB for each Class Vehicle's model year; fraudulent applications for COCs and EOs approved by the EPA and CARB for each Class Vehicles' model year, including vehicle registrations and plates as a result of the fraudulently obtained EPA COCs and EOs; false or misleading communications to the public and regulators; sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented, omitted, and concealed the true nature and quality of the Class Vehicles; documents intended to facilitate the manufacture and sale of the Class Vehicles, such as bills of lading, invoices, shipping records, reports and correspondence; documents to process and receive payment for the Class Vehicles by Plaintiffs and Class Members; and payments to Cummins.

233. Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of their racketeering activities.

234. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive federal and state regulators and consumers and lure consumers, including Plaintiffs and Class members, into purchasing the Class Vehicles, which Defendants knew or recklessly disregarded as containing the emissions control software defeat devices.

235. Many of the precise dates of the fraudulent uses of the U.S. Mail and interstate wire facilities are in the exclusive knowledge of the Defendants and cannot be alleged without access to Defendants' books and records.

CLASS ACTION COMPLAINT
CASE NO.

236.     Defendants have undertaken the practices described herein as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c), as alleged herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain profits, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

237.     Defendants aided and abetted others in violating the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 & 1343 offenses.

238.     To achieve their common goals, Defendants actively and intentionally concealed from the general public, including Plaintiffs and Class members, the unlawfulness and emissions of the Class Vehicles.

239.     Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud in designing, manufacturing, distributing, marketing, testing, and/or selling the Class Vehicles, the Cummins engines, and the emissions control software defeat devices.

240.     For the conspiracy to succeed, each of the Defendants and their co-conspirators agreed to implement and use similar devices and fraudulent tactics—specifically complete secrecy about the emissions control software defeat devices in the Class Vehicles.

241.     Defendants knew and intended that federal and state government regulators, including Plaintiffs and Class members, would rely on the material misrepresentations and omissions made by them about the Class Vehicles. Defendants knew and intended that consumers would incur damages as a result.

242.     Plaintiffs and Class members relied upon Defendants' misrepresentations, omissions, and concealment. Plaintiffs' reliance is made evident by the fact that they purchased Class Vehicles that did not comply with emissions regulations, and which never should have been sold in the United States.

243.     As discussed herein, Defendants engaged in a pattern of related and continuous predicate for at least a decade. The predicate acts constituted various unlawful activities, each conducted with the common purpose of obtaining significant monies and profits from Plaintiffs and Class members based

CLASS ACTION COMPLAINT
CASE NO.

on their misrepresentations, omissions, and concealment, while providing Class Vehicles worth significantly less than the purchase price paid.

244.     The predicate acts all generated significant revenue and profits for Defendants at the expense of Plaintiffs and Class Members. The predicate acts were committed or caused to be committed by Defendants through their participation in the fraudulent enterprise. They involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with remediating the Class Vehicles.

245.     By reason of and as a result of Defendants' conduct, and in particular its pattern of racketeering activity, Plaintiffs and Class members have been injured. Such injuries include but not limited to the overpayment of Class Vehicles at the time of purchase; driving vehicles with emissions systems that are not what a reasonable consumer would expect; wrongfully deprived of their property in that misrepresentations, omissions, and concealment artificially inflated the price for their Class Vehicles.

246.     Defendants' violations of 18 U.S.C. § 1962(c) & (d) have directly and proximately caused injuries and damages to Plaintiffs and Class members, and Plaintiffs and Class members are entitled to bring this action for three times their actual damages, including injunctive and equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter a judgment awarding the following relief:

a.     An order certifying the proposed Class, appointing Plaintiffs as the Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

b.     An order awarding Plaintiffs and Class members their actual damages, punitive damages, and/or any other form of monetary relief by law, except that no monetary relief is presently sought for violations of the Consumers Legal Remedies Act;

c.     An order awarding all appropriate injunctive relief;

d.     An order awarding Plaintiffs and Class members restitution, including at the election of Plaintiffs and Class members, recovery of the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles, disgorgement or other equitable relief provided by law or as the Court deems proper, except that no monetary relief is presently sought for violations of the Consumers Legal Remedies Act;

CLASS ACTION COMPLAINT
CASE NO.

e.   An order awarding Plaintiffs and the class members pre-judgment and post-judgment interest as allowed under the law;

f.   An order awarding Plaintiffs and the class members reasonable attorneys' fees and costs of suit, including expert witness fees; and

g.   An order awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury for all issues so triable under the law.

Dated: February 1, 2024                      Respectfully submitted,

**GIBBS LAW GROUP LLP**

By:   /s/ *Rosemary M. Rivas*
        Rosemary M. Rivas (SBN 209147)
        Amy M. Zeman (SBN 273100)
        Rosanne L. Mah (SBN 242628)
        **GIBBS LAW GROUP LLP**
        1111 Broadway, Suite 2100
        Oakland, CA 94607
        Telephone: (510) 350-9700
        Facsimile: (510) 350-9701
        rmr@classlawgroup.com
        amz@classlawgroup.com
        rlm@classlawgroup.com

        *Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT
CASE NO.